UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BRIAN  HUDKINS, | ) | |
| ANDREW  DAVIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:13-cv-01179-SEB-DML |
| vs. | ) | |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | |
| T. MICHAEL WILSON, | ) | |
| | ) | |
| Defendants. | ) | |

## Order on Pending Motions

This cause is before the Court on three motions: Plaintiffs' objection to the Magistrate

Judge's Order on Defendants' motion to quash deposition notice [Docket No. 74], filed on

December 10, 2014 pursuant to Federal Rule of Civil Procedure 72(a); Defendants' Motion for

Partial Summary Judgment [Docket No. 81], filed on January 12, 2015 pursuant to Federal Rule

of Civil Procedure 56(a); and Plaintiffs' Motion to Strike Notice of Manual Filing [Docket No.

108], filed on July 21, 2015. For the reasons set forth below, Plaintiffs' objection to the

Magistrate Judge's Order is OVERRULED, Defendants' motion for summary judgment is

GRANTED in part and DENIED in part, and Plaintiffs' motion to strike is GRANTED.

## Factual Background

**1.  The September 6, 2012 incident at the Indianapolis J.W. Marriott**

This suit arises out of an unfortunate confrontation between two visitors to Indianapolis

and an officer of the Indianapolis Metropolitan Police Department (IMPD). Plaintiff Brian

Hudkins, the president of a company known as Gramophone, traveled to Indianapolis on

September 5, 2012; his employee Andrew Davis arrived the next day, on September 6. Both men

1

traveled to Indianapolis in order to attend the Custom Electronics Design and Installation Association ("CEDIA") trade show, an annual event in which Gramophone regularly participated. Hudkins Dep. 21–22. Around noon on September 6, Davis checked into the J.W. Marriott hotel in downtown Indianapolis and then departed for the trade show, which was being held at the Indiana Convention Center nearby. Davis Dep. 24–25. Before leaving for the convention center, Davis unpacked a number of his belongings, including his laptop computer and his dress clothes, in his hotel room. *Id.* at 26. After the afternoon session of the convention, Hudkins and Davis met at the J.W. Marriott and went to dinner together at Indianapolis's Rathskeller restaurant; at dinner, Davis drank one full beer and had "several sips" of a second, while Hudkins drank one beer. *Id.* at 28–30.

Hudkins and Davis returned to the J.W. Marriott after dinner. When Davis arrived at what he knew to be his hotel room and attempted to use his key card, the door lock repeatedly flashed red and denied him access. *Id.* at 33. Davis heard someone in the room, and became alarmed that he was "walking in . . . on a theft." *Id.* Davis first flagged down a hotel employee—who told him (erroneously, Davis was sure) that he was on the wrong floor; he then went to the lobby to speak to a manager and called Hudkins to ask for his help in resolving the situation. *Id.* at 34. In the lobby, a hotel manager told Davis that the hotel had removed Davis's belongings from the room into which he had checked in earlier that day without notifying him. The manager acknowledged that Davis's concern was legitimate and that "something was wrong" with what had happened. Klingerman Dep. 37. Hudkins stood near Davis during the conversation, and according to both Davis and Hudkins, hotel staff members repeatedly "changed their stories" about how the mistake had occurred. Davis Dep. 35; Hudkins Dep. 43–44. Hudkins grew increasingly angry when he "realized that they [hotel staff] were appearing to be unwilling to

resolve the situation by returning [Davis] to his room." Hudkins Dep. 43. He acknowledges that in talking to the lobby desk clerk, he used angry hand gestures, yelled, and uttered profanities. *Id.* at 45–46. Hotel security officers approached Hudkins and Davis warning that they would call the police unless the two men calmed down; both Hudkins and Davis then encouraged them to call the police. Hudkins Dep. 48; Davis. Dep. 41.

The J.W. Marriott's security staff did, in fact, call the police. Defendant T. Michael Wilson, an IMPD officer, arrived in the hotel lobby shortly thereafter. Security staff members told Officer Wilson that there had been an error in the assignment of rooms, while Davis told Officer Wilson that the hotel had "robbed" his room. Wilson Dep. 100. Hudkins approached Officer Wilson, who told him to quiet down; the two exchanged further words. Davis Dep. 45. A video taken by a hotel lobby security camera shows that approximately 31 seconds after arriving in the lobby and 16 seconds after his first words with Hudkins, Officer Wilson tackled Hudkins, taking him to the ground. Marriott Lobby Video 22:11:10–22:11:41.[1] The video shows that Hudkins, Davis, Officer Wilson, and a security officer had been standing in a circle for 10 to 15 seconds, when Officer Wilson rushed at Hudkins, spun Hudkins around with his hands held behind his back, and roughly pinned him to the ground in a spot slightly out of the camera's range. *Id.* at 22:11:26–22:11:41. Though the security video is without sound, it shows clearly that Hudkins was never physically aggressive towards Officer Wilson before Wilson subjugated him. *Id.* Hudkins and Davis both recount that Hudkins never resisted Officer Wilson while he was being restrained, and the video footage is consistent with that account. Davis testifies that Officer Wilson nonetheless repeatedly shouted "stop resisting!" to Hudkins as he was restraining him. Davis Dep. 46.

---

[1] Citations to the "Marriott Lobby Video" refer to Plaintiffs' Exhibit 1 [filed manually, *see* Docket No. 95], which contains security camera footage from the J.W. Marriott lobby.

As Officer Wilson was taking Hudkins to the ground, Davis took out his cell phone, announced that he was going to record the confrontation, and then started to do so. *See* Davis Video.[2] Davis maintains that he never touched Officer Wilson or physically interfered with the arrest, and his video footage is consistent with that account. *Id.* Davis testifies, and the video shows, that Officer Wilson pointed his Taser in Davis's direction, directing him to stop his video and to sit down on the ground. Davis Video; Davis Dep. 51, 52. Davis complied, turning off his phone and sitting on the ground; Officer Wilson did not use his Taser on Davis as he had threatened to do. A video taken by a bystander shows Davis sitting with his legs crossed several feet away from Hudkins as Officer Wilson continued to restrain Hudkins. *See* Bystander Video.[3] After he was finished restraining Hudkins, Officer Wilson arrested Davis as well, cuffing his hands behind his back. *Id.* Davis Dep. 53. Security footage from the J.W. Marriott driveway shows two police officers leading Hudkins and Wilson (both with their hands restrained behind their backs) toward a police squad car. Driveway Video 22:16:42 – 22:23:00.[4] The video shows one of the officers throwing Hudkins to the ground near the squad car; a short time later, an officer—less roughly—placed Davis on the ground nearby, where both men remained for several minutes before being taken away. *Id.*

## 2. The incident's aftermath

After Hudkins and Davis were arrested and driven away from the J.W. Marriott hotel, Officer Wilson signed charging informations against both men. He averred that Hudkins had committed three misdemeanors: resisting law enforcement, public intoxication, and disorderly

---

[2] Citations to "Davis Video" refer to Plaintiffs' Exhibit 3 [filed manually, *see* Docket No. 95], which is the brief video taken with Andrew Davis's cell phone.

[3] Citations to "Bystander Video" refer to Plaintiffs' Exhibit 4 [filed manually, *see* Docket No. 95], which is a video taken shortly after Davis's, showing Hudkins, Davis, and Officer Wilson.

[4] Citations to "Driveway Video" refer to Plaintiffs' Exhibit 2 [filed manually, *see* Docket No. 95], which is a security camera video showing the J.W. Marriott driveway immediately outside the main entrance.

conduct, Pls.' Ex. 15; and he accused Davis of disorderly conduct and public intoxication, Pls.' Ex. 16. The Marion County Prosecutor's Office accepted Officer Wilson's affidavits and formally charged the two men. Both appeared at an initial hearing the morning of September 7, 2012, and were released on their own recognizance thereafter. *See* Defs.' Exs. 6, 7 (Hudkins and Davis Chronological Case Summaries).

Because of the nature of the charges, Hudkins's and Davis's cases were assigned to the Marion Superior Criminal Court, Criminal Division, Room 12—commonly known as Courtroom 12 or Community Court. *Id*.; Keffer Aff. at ¶¶ 6–7. Hudkins and Davis jointly retained attorney Bradley Keffer, who entered an appearance on their behalf shortly after their initial hearings. Defs.' Ex. 6; Keffer Aff. at ¶¶ 1, 4, 5. On November 13, 2012, Hudkins and Davis traveled to Indianapolis from Maryland to attend a pretrial conference accompanied by attorney Keffer. At the conference, Deputy Prosecutor Kathy Infanger submitted documents entitled "Plea Agreement" to both men, and both Hudkins and Davis signed their names to the documents.

Hudkins's Plea Agreement provided that "the Defendant shall enter a plea of guilty to and provide a factual basis for" each of the three crimes with which Hudkins had been charged, which were listed in the Agreement. Defs.' Ex. 10 (Hudkins Plea Agmt.). The Agreement further provided that if Hudkins complied with a listed series of terms, the State would agree to dismiss all three counts prior to sentencing. The terms imposed on Hudkins as a condition of the deal, listed on a part of the form under the handwritten heading "Agmt on PC," were as follows: he was to stay away from the J.W. Marriott hotel for 60 days, he was to make a $500 donation to the IMPD's "Clothe a Child" campaign, and he was to avoid any further arrests for a period of 60 days. *Id.* Immediately above Hudkins's signature, the form contains the following statement: "I, Brian Hudkins [name filled in], understand that I am pleading guilty to the charge: Resisting

Law Enf[orcement] [charge filled in], and that my failure to comply in full with the conditions marked agove will result in an executed sentence of not less than 0 days and not more than 365 days to be served in the Marion County Jail or Department of Corrections." *Id.*

Davis's Plea Agreement followed a similar form, imposing on Davis three conditions for dismissal of the charges under the handwritten section heading "Agmt on PC." He, too, was required to stay away from the J.W. Marriott and avoid any arrest for a period of 60 days, and he was required to donate $300 to the Clothe-a-Child campaign (rather than Hudkins's $500). Defs.' Ex. 11 (Davis Plea Agmt.). Like Hudkins, Davis filled in, and signed his name immediately underneath, the following statement: "I, Andrew Davis [name filled in], understand that I am pleading guilty to the charge: Public Intoxication [charge filled in], and that my failure to comply in full with the conditions marked above will result in an executed sentence of not less than 0 days and not more than 180 days to be served in the Marion County Jail or Department of Corrections." *Id.*

After Hudkins and Davis signed their respective Plea Agreements, they departed, and no hearing before a judicial officer was held. Bradley Keffer, who was Plaintiffs' attorney, has submitted an affidavit asserting that, as of this November 13, 2012 pretrial conference, he interpreted his clients' Plea Agreements to be "informal agreement[s] whereby my clients would principally agree to stay away from the JW Marriott and pay a donation to an IMPD charity in exchange for the dismissal of all counts against my clients." Keffer Aff. at ¶ 11. His affidavit further recounts advising his clients at the time that the terms "plea agreement" and "Agmt on PC," as they appeared on the forms, did *not* constitute admissions of guilt. In his words:

> I took both documents to my clients and advised my clients that in my
> professional opinion the notation "agmt on PC" meant that each were [sic]
> agreeing that probable cause had been found by a judge at the Arresting
> Processing Center (Marion County's Initial Hearing Court) when all charges were

> initially filed against each of them. I advised both clients that in my professional
> opinion neither were [sic] admitting that probable cause existed in either of their
> cases, nor admitting guilt in either case.

Keffer Aff. at ¶ 12. Hudkins and Davis have each testified regarding their understanding of the

Plea Agreements they signed and their motives for signing the documents. Hudkins states:

> It was explained to me that the charges were being dismissed; that we would be
> acknowledging that when we had been detained at the jail, we had been before a
> magistrate at the jail, or a judge, whatever the term of the person who handles
> legal matters within the jail, and that we would—that what is sitting before me, as
> I understand, that we were agreeing that the magistrate had, in fact, found that
> there was, as I understand it, probable cause to set this in motion and that was my
> understanding, is that I was acknowledging, in fact, that there was probable cause
> and that we would need to do what we did, which was—in my case, it was a $500
> charge, contribution, whatever the term might be, donation, IMPD check
> something or other here, Clothe A Child. And my recollection is Andrew [Davis]
> was being asked to make a $300 donation of the same and, for that, that these
> charges were being dismissed.

Hudkins Dep. 87–88. Davis testifies as follows about his understanding at the time:

> I signed the document because I wanted everything to go away. I did not want to
> come back to the city. I wanted to move on with my life and not have this hanging
> over my head, and I was told that if stayed away from the [J.W.] Marriott, paid
> the check of $300, that it was done, that would not have the fear hanging over my
> head of what the judge told me the possible ramifications were of the charges that
> he found probable cause on.

Davis Dep. 79.

For her part, Deputy Prosecuting Attorney Kathy Infanger, who was the prosecutor

assigned to Hudkins's and Davis's case, avers that her handwritten notation "agmt on PC,"

which appears on each man's Plea Agreement, signifies that both agreements "were conditioned

on each man's agreement to the existence of probable cause for his arrest." Infanger Aff. at ¶ 4.

She further asserts that the state required the two men to sign the documents because the

"Prosecutor's Office did not want to dismiss the criminal charges against them pursuant to

pretrial diversion without first establishing (a) the existence of probable cause, (b) their

admission of guilt, and (c) foreclosing the possibility that either one of them could file a civil action under state or federal law for false arrest, false imprisonment, or malicious prosecution." *Id.* at ¶ 5. According to Infanger, "[i]f Hudkins and Davis had not agreed to the existence of probable cause for their respective arrests, I would not have moved the Marion Superior Court to dismiss the criminal charges against them." *Id.* at ¶ 6.

Both Hudkins and Davis complied with the terms of their respective plea agreements, and the State accordingly petitioned for the dismissal of the charges against them on January 11, 2013; the Marion Superior Court order dismissing the charges stated that each man's case was dismissed pursuant to "diversion." Defs.' Exs. 12, 13. Each man subsequently petitioned for, and was granted, an expungement of the charges. *Id.*

### 3. Officer Wilson's disciplinary history

Prior to the confrontation at issue in this case, IMPD Officer T. Michael Wilson had previously incurred numerous disciplinary citations in his career as a law enforcement officer. Prior to working for the IMPD, Officer Wilson was an officer with the Lafayette Police Department. While there, he received a one-day suspension after an incident in which, while engaged in a physical struggle with a man who was in handcuffs and shackles, he told the man: "If you kick me, you're fucking dead." Wilson Dep. 29. The IMPD hired Officer Wilson in March 2000. In July 2005, Officer Wilson served a two-day suspension as punishment for an episode of insubordination involving his refusal to obey the orders of a superior officer to assist with a driving under the influence (DUI) investigation. Wilson Dep. 70, Ex. 10. Later in 2005, he served a 10-day disciplinary suspension for three incidents earlier in that year in which he had improperly used a Taser against a suspect who was handcuffed. *See* Defs.' Ex. 15 (Wilson Disciplinary Records). As part of this 2005 disciplinary action, the IMPD sent Officer Wilson for

8

a "psychological fitness for duty" evaluation and required him to attend counseling with its

Employee Assistance Program ("EAP"). *Id.* at 7.

In May 2010, Officer Wilson "illuminated [his] flashlight directly into the lens of [a

citizen's] camera" to prevent the citizen, a bystander to an arrest, from filming the scene. Wilson

Dep. Ex. 2. He served a one-day suspension for this misconduct in August 2010. Defs.' Ex. 15 at

8. In July 2010, Officer Wilson apprehended a bicyclist along the Central Canal path in

Indianapolis by pulling him off his bicycle to the ground and handcuffing him; although the

IMPD did not impose official discipline for this incident, Officer Wilson's supervising sergeant

found that his behavior "displayed a lack of proper discretion and judgment." *Id.* at 9–10. As a

result of this incident, the IMPD removed Officer Wilson from certain of his duties, referred him

again to the EAP, and subjected him to closer "monitoring and mentoring." *Id.* at 10–11. In a

memorandum the next month at the close of this monitoring period, Officer Wilson's supervising

sergeant stated that Officer Wilson did not present "continuing concerns," and recommended that

he be returned to his normal duties, subject to some ongoing heightened supervision. *Id.* at 11.

### 4.  Procedural history and publicity

Brian Hudkins filed suit against Defendants in state court on June 24, 2013; Defendants

timely removed the suit to this court on July 24, 2013. *See* Docket No. 1. A week later,

Indianapolis television station WISH-TV ran a news story about the incident at the J.W.

Marriott, including information about Hudkins's arrest, his guilty plea, and his recently-filed

lawsuit against Officer Wilson and the City of Indianapolis. Docket No. 85 (WISH-TV Story

Tape). As a part of the story, WISH-TV showed portions of the J.W. Marriott lobby security

video, in which both Hudkins and Davis could be seen but neither man's face was readily

recognizable; Hudkins, but not Davis, was mentioned by name in the story. *Id.* Hudkins has

testified that his arrest "became public knowledge as a result of the local TV interview." Hudkins Dep. 13–14.

On January 9, 2014, Andrew Davis filed suit against Defendants in the Southern District of Indiana, where it was initially assigned to Judge Magnus-Stinson of this Court. The Court granted Defendants' motion to consolidate the two cases on December 22, 2014, on the docket of the undersigned judge. Docket No. 75.

### **Plaintiffs' Objection to the Magistrate's Order**

Plaintiffs object to Magistrate Judge Lynch's Order granting in part Defendants' motion to quash deposition notice [Docket No. 70]. We uphold the Magistrate Judge's Order and OVERRULE Plaintiffs' objection.

As part of the discovery process, Plaintiff Brian Hudkins[5] sought to take the deposition of IMPD Chief Richard Hite. Plaintiff sought Chief Hite's testimony primarily concerning an investigation the Chief said he had ordered into Officer Wilson's conduct on the night of September 6, 2012. Shortly after video footage of the incident became public through local news coverage, a reporter approached Chief Hite on camera and asked him whether the video showed excessive force; he responded: "It looks like force was used, the verbal exchange, I will want to hear all that." Order at 5 (citing Docket No. 46 at 3). According to Plaintiff, Chief Hite told the reporter he would order an investigation of the matter: "[Y]ou force me to now request every piece of paper, every document regarding this case for immediate review by internal affairs . . . immediate review." *Id.* Hudkins therefore argued that Chief Hite was "one of, if not the first, investigator[s] of this matter," and that his testimony was essential to Plaintiff's *Monell* claims, in particular, because of his "unique authority" within the police force. *Id.*

---

[5] At the time, Hudkins's and Davis's suits had not yet been joined.

Defendants moved to quash the deposition notice, and Magistrate Judge Lynch granted the motion in part, determining that Plaintiff had not demonstrated the reasonable necessity of Chief Hite's testimony. However, she ordered Chief Hite (or the IMPD) to produce certain previously withheld documents, concluding that such documents were unprotected by the "deliberative process" privilege. She summarized her ruling as follows:

1. There is an insufficient showing at this time that testimony available from Chief Hite is reasonably necessary to obtain information important to any claims or defenses.

2. The Defendants have not established that information possessed by Chief Hite or within his control surrounding any investigation of Officer Wilson is protected by a deliberative process privilege.

3. Chief Hite (or the City) must produce to the Plaintiff the documents he requested regarding Chief Hite's communications with his command staff and Internal Affairs' investigators about Officer Wilson's interactions with the Plaintiff.

Order at 2. Plaintiffs have timely objected to the Magistrate's ruling that Chief Hite's testimony was not "reasonably necessary" to obtain information important to any claims or defenses. Docket No. 74.

In ruling on a party's objection to a non-dispositive order of a Magistrate Judge under Federal Rule of Civil Procedure 72(a), we sustain an objection only if the Magistrate's ruling was "clearly erroneous or contrary to law." Fed. R. Civ. Pro. 72(a). Under this deferential standard, Magistrate Judge Lynch's order stands unless we are "left with the definite and firm conviction that a mistake has been made." *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 126 F.3d 926, 943 (7th Cir. 1997).

In order to shield high-ranking public officials from an excessive and unmanageable volume of subpoenas for their testimony, courts have required a party seeking such testimony to demonstrate that the official has personal knowledge matters directly relevant to claims and

defenses that cannot reasonably be obtained from other, more convenient sources. Order at 6

(citing *Meharg v. I-Flow Corp.*, 2009 WL 1404603, at *1 (S.D. Ind. May 15, 2009); *In re*

*Bridgestone / Firestone Inc. Tires Prods. Liability Litig.*, 205 F.R.D. 535, 536 (S.D. Ind. 2002)).

Plaintiffs insist that Chief Hite does have such personal, unique knowledge:

> [H]e was apparently the first person to determine that an investigation was
> necessary. Chief Hite is in a unique position where only he can explain why he
> initiated an immediate investigation when his own staff had failed to do so in the
> previous eleven (11) months. Further, Chief Hite is the best person that can testify
> as to the specific policies, customs, and practices that allowed him, as Chief of
> Police, to order an immediate investigation after only three views of a video that
> his staff had had eleven (11) months to review, but had apparently seen no need to
> investigate. Further, Chief Hite i[s] in the unique position of having personal
> knowledge of the rarity or frequency he has participated in and/or ordered an
> immediate investigation of an officer.

Docket No. 74 (Pls.' Obj.) at 3–4.

While Chief Hite may have personal knowledge of whether or not he actually ordered an

"investigation" into the J.W. Marriott incident in response to a television reporter's questions

(after this suit had been filed), Plaintiffs have utterly failed to demonstrate that he has any

personal knowledge of the events of September 6, 2012—or indeed any personal knowledge of

Officer Wilson at all. As Defendants point out, their objection incorporates the language of

*Monell*, but deploys such language outside its proper context; Chief Hite undoubtedly has some

knowledge of the IMPD's policies, customs, and practices—as would any police chief—but

Plaintiffs' objection does not demonstrate that he has access to any information relevant to *this*

*case* that cannot be as easily obtained from other sources. *Cf. Warzon v. Drew,* 155 F.R.D. 183,

185 (E.D. Wis. 1994). Plaintiffs do not contend that Magistrate Judge Lynch employed the

wrong legal standard in ruling on the motion to quash, and they have not called into question the Magistrate's sound application of that law to their efforts to depose Chief Hite.[6]

We therefore OVERRULE Plaintiffs' objection to the Magistrate Judge's November 26, 2014 Order on Defendants' motion to quash deposition notice, and uphold the Order.

## Defendants' Motion for Partial Summary Judgment

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986).  The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

---

[6] Plaintiffs also object, irrelevantly, that Chief Hite's testimony is not protected by the "deliberative process" privilege. Docket No. 74 at 5. But Magistrate Judge Lynch's Order never said that it was; in fact, she ruled that the documents Plaintiffs sought from Hite and the IMPD were *not* protected by the privilege, and must be disclosed. Docket No. 70 at 7–9.

**Discussion**

Plaintiffs Hudkins and Davis jointly assert the following causes of action: unlawful arrest under the Fourth Amendment against Officer Wilson, excessive force under the Fourth Amendment against Officer Wilson, malicious prosecution against both Defendants, *Monell* municipal liability for failure to train and discipline under 42 U.S.C. § 1983, common-law negligence against both Defendants, false light invasion of privacy against both Defendants, and negligent infliction of emotional distress against both Defendants. Docket No. 41 (Hudkins Second Am. Compl.); Cause No. 1:14-cv-22-JMS-DML, Docket No. 19 (Davis Am. Compl.). Plaintiff Hudkins additionally brings the following claims: two instances of battery against both Defendants, defamation *per se* against both Defendants, and negligent retention and training against the City of Indianapolis. Hudkins Second Am. Compl. Lastly, Plaintiff Davis brings his own claims for First Amendment retaliation against Officer Wilson and assault against both Defendants. Davis Am. Compl.

Defendants concede that genuine issues of material fact preclude judgment as a matter of law on Plaintiff Hudkins's Fourth Amendment excessive force claim against Officer Wilson, his battery claim against the City of Indianapolis, and his negligent infliction of emotional distress claim against the City of Indianapolis. Defs.' Br. 1–2. They seek summary judgment on all the other claims, which we address in turn.

**I.     Fourth Amendment false arrest against Officer Wilson (Hudkins Count I, Davis Count II)[7]**

---

[7] Hudkins's Second Amended Complaint contains a separate Fourth Amendment count, Count II, that states no specific claim. Since we read Count I as encompassing both his excessive force and false arrest Fourth Amendment claims, we dismiss Count II as duplicative.

Both Plaintiffs allege that Officer Wilson subjected them to "false arrest" in violation of the Fourth Amendment. Hudkins Second Am. Compl. at ¶¶ 65–73; Davis Am. Compl. at ¶¶ 50–58. Defendants seek summary judgment on two grounds: that Plaintiffs' admission of probable cause in signing the Plea Agreements is fatal to their claim, and, alternately, that the claim is barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994). Defs.' Br. 7–12. We conclude that both of Defendants' arguments for summary judgment are foreclosed by Seventh Circuit precedent. Because Plaintiffs cannot establish a genuine issue of material fact with respect to the actual existence of probable cause, however, we grant summary judgment as to the false arrest claims.

**A. Judicial estoppel**

Plaintiffs bring their false arrest claim, like all of their federal claims, under the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983 ("Section 1983"), which provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 itself grants no substantive rights; rather, a plaintiff may use it as a conduit through which to allege that he suffered the violation of a specific right guaranteed by the Constitution or federal law. Here, Plaintiffs claim that Officer Wilson deprived them of their right to be free of "unreasonable search and seizure" under the Fourth Amendment. U.S. Const. Amend. IV. *See generally Wallace v. City of Chicago*, 440 F.3d 421, 425 (7th Cir. 2006).

If a police officer makes an arrest that is supported by probable cause—even if he does so without a warrant—then the arrest is "reasonable" under the Fourth Amendment. *Devenpeck v. Alford,* 543 U.S. 146, 152–153 (2004). The existence of probable cause is thus an absolute

defense to a claim for false arrest under the Fourth Amendment. *Chelios v. Heavener,* 520 F.3d 678, 685–686 (7th Cir. 2008) (citing *Wagner v. Washington Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007)).

In their initial brief, Defendants do not argue that, as a matter of fact, probable cause existed for the arrest of Hudkins and Davis. Rather, they contend that judicial estoppel forecloses both Plaintiffs from denying that Officer Wilson had probable cause to arrest both of them on the night of September 6, 2012. Judicial estoppel is "an equitable concept providing that a party who prevails on one ground in a lawsuit may not . . . in another lawsuit repudiate that ground." *See Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005) (quoting *United States v. Hook,* 195 F.3d 299, 306 (7th Cir. 1999)). As enunciated by the Supreme Court, several factors govern the doctrine's application. *See generally New Hampshire v. Maine,* 532 U.S. 742, 750 (2001). First, the party in question must take a factual position that is clearly inconsistent with one it earlier took before a court. *New Hampshire,* 532 U.S. at 750. Second, the party to be estopped must have succeeded in persuading a court to accept that party's earlier position—such that a court's acceptance of the new position would create the impression that one or the other of the courts had been misled. *Id.*; *EEOC v. Autozone, Inc.*, 2009 WL 464574, at *2 (C.D. Ill. Feb. 23, 2009). Lastly, the court must consider whether the party to be estopped would derive an unfair advantage from its inconsistent positions. *New Hampshire,* 532 U.S. at 751.

The Seventh Circuit considered a similar claim in *Wells v. Coker,* 707 F.3d 756 (7th Cir. 2013). There, a man who had been accused of pointing a gun at a police officer and charged with reckless conduct pled guilty to that charge at a plea hearing; he later sued the officer for using excessive force in making the arrest under the Fourth Amendment. 707 F.3d at 758–760. In considering whether the plaintiff was estopped by this earlier guilty plea from bringing an

16

excessive force claim, the court observed as an initial matter that "[t]he doctrine of judicial estoppel prevents a party from *prevailing* on an argument in an earlier matter and then relying on a contradictory argument to prevail in a subsequent matter." 707 F.3d at 760 (emphasis added) (quoting *New Hampshire,* 532 U.S. at 749 (2001)). It noted *New Hampshire*'s three-part test for judicial estoppel, but reasoned that conducting such an analysis was unnecessary, because a party entering a plea agreement does not "prevail." In the court's words:

> We need not reach this test, however, since Wells did not "prevail" in his criminal case. After pleading guilty to reckless conduct, Wells was sentenced to two years of probation and two days in jail. At best, perhaps one could say that Wells "prevailed" in the sense that he avoided a trial for reckless discharge of a firearm, a felony for which Wells, if convicted, likely would have received a more onerous sentence. But this argument is specious. After all, Wells could have been acquitted had he gone to trial on the felony charge. Moreover, the State also benefitted from its compromise with Wells, trading the uncertainty of a jury trial for a known outcome while conserving prosecutorial resources. Given the compromise nature of this plea agreement, referring to Wells as the prevailing party is a bridge too far.

707 F.3d at 760–761. *Wells* is sufficiently analogous to the case before us that it compels us to reach the same conclusion: judicial estoppel does not apply here.[8]

## B. *Heck v. Humphrey* doctrine

In *Heck v. Humphrey,* 512 U.S. 477 (1994), the Supreme Court held that any suit for damages premised on a violation of civil rights is barred if the basis for the suit is inconsistent with or would undermine the constitutionality of a conviction or sentence. 512 U.S. at 486–487; *Wiley v. City of Chicago,* 361 F.3d 994, 996 (7th Cir. 2004). To bring such a claim, a plaintiff "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or

---

[8] Other courts of appeal have divided on this question. *Compare Thore v. Howe,* 466 F.3d 173, 183–186 (1st Cir. 2006) (holding that earlier guilty plea does not estop plaintiff from bringing civil rights claim based on arrest), *with Bradford v. Wiggins,* 516 F.3d 1189, 1194–1195 (10th Cir. 2008) (holding that judicial estoppel does apply to bar false arrest claim where plaintiff had earlier pled guilty to offense for which he had been arrested).

called into question by a federal court's issuance of a writ of habeas corpus." *Id.* As the Court later clarified in *Wilkinson v. Dotson,* 544 U.S. 74 (2005), this doctrine is designed to prevent prisoners in custody from making an "end run" around the limitations of the habeas corpus remedy. 544 U.S. at 81–82, 91. "If success in the lawsuit would not spell immediate or speedier relief from custody, then Section 1983 remains available for use, and *Heck* does not bar the action." *Jogi v. Voges,* 480 F.3d 822, 836 (7th Cir. 2007).[9]

*Heck* does not apply here, for two reasons. First, as the Seventh Circuit has often noted, "the civil rights claims of false or wrongful arrest arising out of the Fourth Amendment begin to accrue at the time of arrest regardless of subsequent proceedings." *Wiley,* 361 F.3d at 996–997 (citing *Copus v. City of Edgerton,* 151 F.3d 646, 648–49 (7th Cir. 1998); *Booker v. Ward,* 94 F.3d 1052, 1056 (7th Cir. 1996); *Simpson v. Rowan,* 73 F.3d 134, 136 (7th Cir. 1995)). "The rationale behind this approach is that a wrongful arrest claim does not necessarily undermine a conviction; 'one can have a successful wrongful arrest claim and still have a perfectly valid conviction.'" *Id.* (quoting *Booker,* 94 F.3d at 1056). Second, Plaintiffs were not in custody when they brought this suit, nor were they ever in custody pursuant to a criminal conviction; in fact, their charges were dismissed upon completion of the terms specified in their plea agreements. Defs.' Exs. 11, 12. They are thus outside the class of plaintiffs with which the *Heck* doctrine is concerned, for there is no danger that they have brought this suit to evade the requirement that challenges to the terms of confinement be brought under the habeas statute. *See Jogi,* 480 F.3d at 836; *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 638 (6th Cir. 2008) (holding that *Heck* does

---

[9] The Seventh Circuit's gloss on *Heck* and progeny—which focuses on the doctrine as attempting to prevent the inefficient overlap of habeas corpus and Section 1983—is not a universally accepted one. As the Fifth Circuit noted in *DeLeon v. City of Corpus Christi,* 488 F.3d 649 (5th Cir. 2007), divisions of interpretation persist in the fractured decisions of the Supreme Court itself. 488 F.3d at 656 (citing *Spencer v. Kemna,* 523 U.S. 1 (1998)). We believe that *Jogi* clearly states the Seventh Circuit's position on the question, and that we are bound to follow that interpretation.

not apply where plaintiff "was never in custody, was not convicted or sentenced, and was never eligible for habeas corpus relief").

The Seventh Circuit has held that a successful false arrest claim does not necessarily undermine the validity of a conviction arising from that arrest; moreover, it has held that *Heck* primarily governs challenges impacting a plaintiff's *confinement* rather than to the bare fact that he was found guilty. Thus, even if we interpreted Plaintiffs' plea agreements as akin to "convictions," as some courts have, *see, e.g., Gilles v. Davis,* 427 F.3d 197, 209–212 (3d Cir. 2005), *Heck* doctrine would still be inapplicable to Plaintiffs' false arrest claim here.[10]

## C. Actual existence of probable cause

Defendants' initial brief in support of their motion for summary judgment addressed only the question of whether Hudkins and Davis had judicially *admitted* that probable cause existed; it was only after Plaintiffs themselves raised the purported nonexistence of probable cause as a matter of *fact*—and Defendants replied in kind—that the parties grappled with the more pertinent question here. Because Plaintiffs have not succeeded in creating a genuine dispute of fact as to whether Officer Wilson had probable cause to arrest both men for disorderly conduct, they cannot prevail on their false arrest claims.

Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez v. City of Elgin,* 578 F.3d 526, 537 (7th Cir. 2009) (citing *Michigan v. DeFillippo,* 443 U.S. 31, 37 (1979)). The Seventh Circuit has often noted that

---

[10] Defendants center their *Heck* argument around the notion that Plaintiffs' "pretrial diversion" should be considered equivalent to a conviction, but they do not effectively grapple with *Heck*'s fundamental conceptual limitations. Defs.' Br. 10–11.

probable cause is a "fluid concept," whose existence depends on the common sense of police officers in evaluating the totality of the circumstances. *Thayer v. Chiczewski,* 705 F.3d 237, 246–247 (7th Cir. 2012) (quoting *United States v. Reed,* 443 F.3d 600, 603 (7th Cir. 2006)). "To make this determination, we must 'step[ ] into the shoes of a reasonable person in the position of the officer[,]' considering the facts known to the officer at the time . . . . This is an objective inquiry; we do not consider the subjective motivations of the officer." *Id.* (quoting *Wheeler v. Lawson,* 539 F.3d 629, 634 (7th Cir. 2008)) (additional citations omitted).

Whether probable cause for a given offense exists depends on the elements of that offense as defined by the applicable substantive law—here, Indiana law. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 715 (7th Cir. 2013). Plaintiffs' claim for false arrest thus fails if probable cause existed for Officer Wilson to arrest Hudkins and Davis for at least one of the crimes of which each man was ultimately charged. *See Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir. 2006) ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge.") (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)). *See also Jackson v. Parker,* 627 F.3d 634, 639 (7th Cir. 2010). Defendants focusing on establishing that there was probable cause to arrest both Hudkins and Davis for disorderly conduct.

Under Indiana law, a person commits disorderly conduct, a Class B misdemeanor, when he "recklessly, knowingly, or intentionally: (1) engages in fighting or in tumultuous conduct; (2) makes unreasonable noise and continues to do so after being asked to stop; or (3) disrupts a lawful assembly of persons." Ind. Code § 35-45-1-3. In his probable cause affidavits, Officer Wilson stated that as he walked into the lobby of the J.W. Marriott, he found that several patrons in the lobby were pointing to the "disturbance" created by Hudkins and Davis; he estimated that

some 50 people in the lobby had gathered by the time he confronted the two men. Defs.' Ex. 8

(Hudkins PC Aff.). Officer Wilson averred that, as he approached, Davis was "yelling and

waving his finger and hard [sic]" at Tony Gaviola, the Marriott security officer; according to

Officer Wilson, Davis then turned and began to gesture angrily toward him. *Id.* Officer Wilson

stated that he warned Davis to "lower his voice," but Davis did not comply and "continued to

rant." *Id.* He recounted that Hudkins then inserted himself into the conversation: "I was

interrupted by Mr. Hudkins, who also in a very loud voice joined into the conversation. I directed

my attention towards Mr. Hudkins and gave him the same warning to lower his voice. To which

Mr. Hudkins replied that he did not have to."[11] *Id. See also* Defs.' Ex. 9 (Davis PC Aff.).[12]

While Plaintiffs dispute some other aspects of Officer Wilson's probable cause affidavits,

they do not dispute the portions excerpted above. Moreover, their deposition testimony and the

J.W. Marriot lobby video are consistent with Officer Wilson's account in at least some respects.

Both men have testified that they were speaking in loud, angry voices during their encounter

with the security officers and Officer Wilson, Hudkins Dep. 43–55; Davis Dep. 43, and both men

acknowledge being asked to lower their voices and refusing to do so. Hudkins Dep. 54; Davis

Dep. 42–43. The lobby security video does not record the sound or volume of the men's voices,

but it shows both men speaking with forceful gestures, with Hudkins pointing angrily back

toward the hotel desk—though not directly at the officer. Marriott Lobby Video 22:11:10–

22:11:26.

Uncontroverted evidence indicates that Hudkins and Davis were speaking loudly and

gesturing angrily, and had created a scene in the hotel lobby that had attracted the attention of

---

[11] The affidavit goes on to state that Hudkins stuck his finger in Officer Wilson's face. Plaintiffs specifically dispute that assertion, which is not supported by the J.W. Marriott lobby video of the incident.
[12] Officer Wilson's probable cause affidavit as to Davis is functionally identical to that he which submitted for Hudkins.

numerous spectators; Officer Wilson asked both men to calm down and lower their voices, and both men refused. This is sufficient to establish probable cause for a disorderly conduct arrest under Indiana law. *See Anderson v. State,* 881 N.E.2d 86, 91–92 (Ind. Ct. App. 2008) (upholding disorderly conduct conviction where defendant had engaged in verbal outbursts and had "refused to stop talking and leave the business after the officers asked him several times to do so"); *Blackman v. State,* 868 N.E.2d 579, 584 (Ind. Ct. App. 2007) (upholding disorderly conduct conviction where defendant created a "commotion" that "drew a crowd" and refused officer's requests to lower her voice).[13]

Defendants' motion for summary judgment on Plaintiffs' claims for false arrest against Officer Wilson under the Fourth Amendment is accordingly GRANTED.

## II.   Malicious Prosecution against Officer Wilson and the City of Indianapolis (Hudkins Count V; Davis Count IV)

Both Plaintiffs bring state-law malicious prosecution claims against Officer Wilson and the City of Indianapolis. Hudkins Second Am. Compl. at ¶¶ 92–98; Davis Am. Compl. at ¶¶ 63–69. The claim fails because Defendants enjoy immunity under Indiana law.

The Indiana Tort Claims Act ("ITCA") selectively waives the state's sovereign immunity. Among the exceptions it recognizes to this waiver, however, is that "[a] governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he initiation of a judicial or an administrative proceeding." Ind. Code § 34-13-3-3(6). As both Indiana courts and federal courts applying Indiana law have consistently

---

[13] Although the parties have not addressed the issue, we note that even had Plaintiffs succeeded in creating a factual issue regarding the existence of probable cause, the clear presence of "arguable probable cause" would be sufficient to furnish Officer Wilson qualified immunity. "Officers are also afforded an extra layer of protection through the defense of qualified immunity (also known as arguable probable cause)." *Thayer,* 705 F.3d at 247. An officer "is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, 'a reasonable officer could have mistakenly believed that probable cause existed.'" *Id.* (quoting *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 879 (7th Cir. 2012)) (additional citations omitted).

recognized, this provision of the ITCA immunizes law enforcement officials and state entities

from suit for malicious prosecution. *Butt v. McEvoy,* 669 N.E.2d 1015, 1017–1018 (Ind. Ct. App.

1996) (noting Indiana courts' established conclusion that "the legislature fully intended to extend

immunity to the State of Indiana and other political subdivisions and their police officers in

actions for malicious prosecution") (citing *Livingston v. Consol. City of Indianapolis,* 398

N.E.2d 1302, 1305 (Ind. Ct. App. 1979)); *Alexander v. McKinney,* 692 F.3d 553, 556 (7th Cir.

2012) ("Although Indiana provides a state law claim for malicious prosecution, the state grants

broad immunity to governmental employees from the claim."). Indiana's sovereign immunity

thus bars Plaintiffs' claims against Officer Wilson and the City of Indianapolis for malicious

prosecution.

       In their opposition to summary judgment, Plaintiffs contend that their complaints also

state federal claims for malicious prosecution under 42 U.S.C. § 1983. The plain language of

both documents is at odds with any such interpretation. Hudkins's Second Amended Complaint

and Davis's Amended Complaint contain essentially identical counts alleging malicious

prosecution. Both recite the elements of the *state-law* cause of action as enunciated by *Crosson

v. Berry,* 829 N.E.2d 184, 189 (Ind. Ct. App. 2005). Hudkins Second Am. Compl. at ¶ 93; Davis

Am. Compl. at ¶ 64. Neither count mentions Section 1983, any constitutional provision, or

indeed any federal statute or cause of action at all. This is in stark contrast with Plaintiffs' other

federal claims, in support of which their respective complaints explicitly mention both Section

1983 and the specific constitutional provision under which the claim arises. *Cf.* Hudkins Second

Am. Compl. at ¶¶ 65–73 (unlawful arrest and excessive force); Davis Am. Compl. at ¶¶ 39–49

(First Amendment retaliation); Davis Am. Compl. at ¶¶ 50–58 (unlawful arrest and excessive

force).

Plaintiffs protest that we should read the malicious prosecution counts as stating a claim under Section 1983 because, in other portions of their complaints, both Hudkins and Davis allege that Officer Wilson was "acting under color of state law." *See* Pls.' Resp. 17 (citing Hudkins Second Am. Compl. at ¶¶ 6, 67, 76; Davis Am. Compl. at ¶¶ 8, 41, 52). This observation is true enough, but meaningless. An accusation that a person acted under color of state law is necessary, but not sufficient, to state a claim under Section 1983; a whole host of state or federal claims have the same prerequisite. Plaintiffs remind us that the Rules of Civil Procedure establish a notice pleading regime, where a claim can proceed so long as a defendant has sufficient notice of the substance of the claim and the relief sought. *Id.* (citing *Brock v. U.S. Steel Corp.*, 2010 WL 405620, at *3 (N.D. Ind. Jan. 27, 2010)). Here, however, Plaintiffs' complaints explicitly frame their malicious prosecution counts in state-law terms and omit any signs that would give Defendants reasonable notice that they sought relief under Section 1983 for malicious prosecution. Plaintiffs demonstrated in both complaints that they understood how to state a federal claim when they so desired, and they did not do so with respect to malicious prosecution.[14]

In the absence of a federal claim, we GRANT Defendants' motion for summary judgment on Plaintiffs' state-law claims malicious prosecution claims in light of Indiana's grant of immunity.[15]

---

[14] Another piece of circumstantial evidence that Plaintiffs did not intend to state a federal malicious prosecution claim—if any further evidence were needed—is that unlike the other federal claims in the complaints, the malicious prosecution claims are directed against both Officer Wilson *and* the City of Indianapolis. While *respondeat superior* exists under state law, there is no such supervisory liability, of course, in claims brought pursuant to Section 1983.

[15] Even if Plaintiffs had stated a federal claim, such a claim would be subject to summary judgment for its failure to allege the violation of a specific federal right. The Seventh Circuit held in *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), that Indiana's broad immunity scheme fails to grant victims of due process violations an adequate post-deprivation remedy; as a result, it recognized an exception under *Parratt-Hudson* doctrine and made a federal forum available for allegations of malicious prosecution by Indiana state actors. 732 F.3d at 846–848. Nevertheless, "[f]ederal courts are rarely the appropriate forum for malicious prosecution claims." *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011). Vague allegations of due process or "Fourteenth Amendment" deprivations will not

## III.     First Amendment Retaliation against Officer Wilson (Davis Count I)

Davis claims that Officer Wilson arrested him in retaliation for an exercise of protected speech rights, in violation of the First Amendment. Davis Am. Compl. at ¶¶ 39–49.[16] Specifically, he alleges that Officer Wilson arrested him in response to his attempt to make a video recording of Officer Wilson's confrontation with Hudkins in the J.W. Marriott lobby. *Id.* at ¶¶ 42–46.

In their initial brief in support of summary judgment, Defendants challenged this claim on the same grounds they had challenged Plaintiffs' false arrest claims—that Plaintiffs had admitted to the existence of probable cause for the arrests and were thus judicially estopped from taking a contrary position now. Defs.' Br. 14. As we have already discussed, we reject this argument. *See supra,* § I(A). In an order issued on July 7, 2015, the Court directed the parties to brief the issue of qualified immunity as it may apply to Plaintiffs' First Amendment and

---

do. Rather, to state a viable malicious prosecution claim under Section 1983, a plaintiff must "alleg[e] a violation of a particular constitutional right, such as the right to be free from unlawful seizures under the Fourth Amendment, or the right to a fair trial under the Due Process Clause." *Welton v. Anderson,* 770 F.3d 670, 673 (7th Cir. 2014). Plaintiffs' complaints contain no such specificity, referring only to prosecution in the absence of probable cause. Though it is undoubtedly a tort, this accusation of "malicious prosecution" *simpliciter* is not an adequate predicate for a Section 1983 action. *Id.* at 674 ("Malicious prosecution is not by itself an infringement on the constitutional right to due process under the Fourteenth Amendment.").

[16] In their response to summary judgment, Plaintiffs argue that Davis's claim "is broader in scope than just retaliation." Pls.' Resp. 20. They seek to treat Officer Wilson's threatened use of a Taser and his order to Davis to sit on the ground as separate violations from his subsequent arrest—with the goal, presumably, of disentangling those actions from the shield which the existence of probable cause for the arrest furnishes Officer Wilson. Davis's Amended Complaint, however, alleges that Officer Wilson "threatened the Plaintiff and subsequently arrested him," which "unlawfully penalized Plaintiff for exercising his rights." Davis Am. Compl. at ¶¶ 45–46. Plaintiffs' theory that several separate constitutional violations occurred is unconvincing in light of the allegations stated in Davis's Amended Complaint, and it is internally inconsistent; in their brief, Plaintiffs go on to argue that "a person may not be detained *even momentarily* without reasonable, objective grounds for doing so . . . . The moment that Officer Wilson pulled his weapon and effectively directed Davis to stop recording, he violated Davis's First Amendment rights." Pls.' Resp. 20 (emphasis original). The legal standard governing a pre-arrest stop or "detention," of course, is a lower threshold than probable cause; the qualified immunity analysis we engage in below would apply *a fortiori* to a claim that Officer Wilson's detaining Davis with his Taser constituted a First Amendment violation. *See Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968) (noting that "a seizure occurs whenever a police officer "by means of physical force or show of authority . . . in some way restrain[s] the liberty of a citizen" and describing the reasonable suspicion governing such seizures, as broadly defined). As we have already noted, Officer Wilson had probable cause—and thus also "reasonable suspicion"—in support of stopping and arresting Davis for at least disorderly conduct.

excessive force claims. Docket No. 103. That issue having been briefed, we now address whether qualified immunity shields Officer Wilson from liability for this claim.

When they are accused of violating a plaintiff's constitutional rights, state actors are entitled to qualified immunity for their actions unless they violated constitutional or statutory rights that were "clearly established" at the time of their conduct. *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)) (additional citations omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties *reasonably*." *Id.* (emphasis added). Following guidance laid down by the Supreme Court, courts typically address a public employee's claim of qualified immunity by way of a two-part test. First, we ask the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). If so, we proceed to determine whether the right in question was "clearly established" at the time of the officer's conduct. *Id.*; *Volkman v. Ryker,* 736 F.3d 1084, 1090 (7th Cir. 2013). Although the Supreme Court has clarified that federal courts are no longer required to tackle the two questions in that order, *see Pearson v. Callahan,* 555 U.S. 223, 233–236 (2009), we find it convenient and appropriate to do so here, in large part because the existence of a constitutional violation is relevant to the viability of Plaintiffs' *Monell* claims. *See infra,* § V.

**A. Whether a First Amendment violation occurred**

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would

likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the police officer's decision. *Thayer v. Chiczewski,* 705 F.3d 237, 251 (7th Cir. 2012); *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012). Davis undoubtedly suffered the "deprivation" of arrest, *see Thayer,* 705 F.3d at 251, and we also conclude that he engaged in constitutionally protected activity. The First Amendment prohibits government officials "from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore,* 547 U.S. 250, 256 (2006). Because the American conception of "free speech" encompasses not just a citizen's right to express himself, but also his right to obtain and disseminate information about matters of public concern, most courts of appeal, including the Seventh Circuit, have acknowledged that the First Amendment broadly protects the right to make audio or visual recordings of police activity. *See ACLU v. Alvarez,* 679 F.3d 583, 597 (7th Cir. 2012); *Glik v. Cunniffe,* 655 F.3d 78, 84–85 (1st Cir. 2011); *Smith v. City of Cumming,* 212 F.3d 1332, 1333 (11th Cir. 2000). The issue of causation, however, is more troublesome for Plaintiffs.

The viability of a claim for retaliatory arrest is complicated by the question of probable cause: if the police officer had a valid reason to arrest the plaintiff for *some* offense, then the plaintiff must succeed at the difficult task of disentangling such probable cause from an impermissible retaliatory motive. The Seventh Circuit has prescribed a familiar path through this thicket, setting forth a burden-shifting framework similar to that employed in Title VII cases. *See Greene v. Doruff,* 660 F.3d 975, 977–978 (7th Cir. 2011). Under this framework, the plaintiff's initial burden is to show that a violation of his First Amendment rights was a "motivating factor of the harm he's complaining of." *Thayer*, 705 F.3d at 251 (quoting *Greene,* 660 F.3d at 977). If the plaintiff makes this prima facie showing, the burden shifts to the defendant to show that the

harm—here, the arrest—would have occurred anyway. *Id. See also Brown v. Cnty. of Cook,* 661 F.3d 333, 335 (7th Cir. 2011). The existence of probable cause for the arrest is "strong evidence," of course, that an arrest would have occurred regardless of the protected activity. *Id. See also Reichle v. Howards,* 132 S. Ct. 2088, 2095–2097 (2012). Finally, "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 252 (citing *Zellner v. Herrick,* 639 F.3d 371, 379 (7th Cir. 2011)).

Plaintiffs have satisfied their prima facie burden here. Davis's testimony, and the brief cell phone video that Davis took before Officer Wilson ordered him to turn the camera off, show that Officer Wilson pointed his Taser at Davis almost immediately after Davis announced that he was filming, and physically restrained him shortly thereafter. An officer's shouted command to "sit on the ground right now"—coming as an instantaneous response to an act of protected speech, certainly entitles Plaintiffs to the inference that Davis's video-recording was a motivating factor in what followed. *See* Davis Video; Bystander Video; Davis Dep. 52.

Defendants respond, and we have already agreed, that Officer Wilson had probable cause to arrest Davis—at least for the offense of disorderly conduct. *See supra,* § I(C). "Probable cause, if not a complete bar to [a plaintiff's] First Amendment retaliatory arrest claim, provides strong evidence that he would have been arrested regardless of any illegitimate animus." *Thayer,* 705 F.3d at 252 (citing *Reichle,* 132 S. Ct. at 2095–97); *see also Hernandez v. Cook Cnty. Sheriff's Office,* 634 F.3d 906, 915 (7th Cir. 2011) ("[E]vidence of probable cause may act as highly valuable circumstantial evidence that the complained-of conduct would have occurred even without a retaliatory motive."). The Supreme Court has held that the presence of probable cause bars a First Amendment retaliatory *prosecution* claim, *Hartman v. Moore,* 547 U.S. 250,

28

261–265 (2006), but the situation is less clear-cut when the plaintiff alleges retaliatory *arrest.*
*See Reichle,* 132 S. Ct. at 2096 ("To be sure, we do not suggest that *Hartman*'s rule in fact
extends to arrests."). Here, a finder of fact could infer from Officer Wilson's prior discipline for
improperly attempting to suppress a bystander's attempt to record him, Wilson Dep., Ex. 2, and
from his own deposition testimony on his past general practice, Wilson Dep. 74, 77, that Officer
Wilson pointed his Taser at Davis, ordered him to get on the ground, and subsequently arrested
him because he was attempting to take a cell phone video of the Hudkins encounter—and not
because Davis had been engaging in disorderly conduct. This is sufficient evidence from which
to infer that Officer Wilson's proffered justification for his action was pretext. *See Massey v.*
*Johnson,* 457 F.3d 711, 720 (7th Cir. 2006); *Gullick v. Ott,* 517 F. Supp. 2d 1063, 1069 (W.D.
Wis. 2007).

We therefore conclude that Plaintiffs have created a genuine issue of material fact as to
whether Davis suffered a constitutional deprivation.

**B. Whether the right was "clearly established"**

Our resolution of the second prong of the qualified immunity analysis is dictated by the
Seventh Circuit's holding in *Thayer v. Chiczewski,* 705 F.3d 237 (7th Cir. 2012). In *Thayer,* the
court noted that the Supreme Court's successive decisions in *Hartman* and *Reichle* have fostered
uncertainty—and a circuit split—regarding the effect of probable cause on First Amendment
retaliatory arrest claims. 705 F.3d at 253. As it had previously, the *Thayer* court declined to
address the underlying issue, but it did reach a clear conclusion as to its implications for
qualified immunity.  "The 'clearly established' standard is not met in this case because neither
our circuit nor the Supreme Court has 'recognized a First Amendment right to be free from a
retaliatory arrest that is supported by probable cause.'" *Id.* (quoting *Reichle,* 132 S. Ct. at 2093).

The Seventh Circuit has not provided any further guidance on this issue since *Thayer,* and we are thus compelled to conclude that, as of September 2012, Officer Wilson's conduct toward Davis—even if it was retaliatory—was shielded by qualified immunity.[17] In our order for supplemental briefing, we specifically invited Plaintiffs to respond to *Thayer.* Other than an irrelevant attempt to distinguish this case from *Thayer* on its facts, however, Plaintiffs have failed to take up this admittedly daunting challenge.[18]

We accordingly GRANT Defendants' motion for summary judgment with respect to Plaintiff Davis's First Amendment retaliation claim.

## IV.    Excessive Force against Officer Wilson (Davis Count II)

Both Plaintiffs assert claims against Officer Wilson for excessive force under the Fourth Amendment, Hudkins Second Am. Compl. at ¶ 71; Davis Am. Compl. at ¶ 56, but Defendants seek summary judgment only as to Davis's claim, conceding that genuine issues of material fact preclude summary judgment on Hudkins's claim. Defs.' Br. 1.[19]

---

[17] Our conclusion on this matter is dictated by clear precedent; we nonetheless find *Thayer*'s implications to be troubling, even if the Seventh Circuit's ruling is a logical application of the heightened bar for "clearly established" rights as clarified by *Ashcroft v. al-Kidd,* 131 S. Ct. 2074 (2011). As it currently stands, qualified immunity doctrine will often shield an officer who reasonably believes he has *cover* for his actions, rather than one who reasonably believes his actions are actually legal. We are not alone in finding these developments dismaying. *See, e.g.,* Erwin Chemerinsky, *Closing the Courthouse Doors,* 90 Denv. U. L. Rev. 317 (2012).

[18] Specifically, Plaintiffs contend that because there was no evidence of pretext in *Thayer*—in other words, the plaintiff there had failed to satisfy the first prong of the two-part qualified immunity inquiry as well as the second—*Thayer* is distinguishable. Pls.' Supp. Resp. 8–9. This simply sidesteps *Thayer*'s clear holding with regard to whether the right in question was "clearly established."

[19] After we ordered the parties to brief the issue of qualified immunity with respect to the First Amendment and excessive force claims at issue on summary judgment, Defendants attempted to retract this concession, contending that summary judgment should be granted against both Hudkins and Davis. Even if our order on supplemental briefing did not explicitly state that Hudkins's claim was not fair game, we will not allow Defendants to resuscitate an argument they so clearly swore off in their initial brief. *See Hernandez v. Cook Cnty. Sheriff's Office,* 634 F.3d 906, 913 (7th Cir. 2011); *Sere v. Bd. of Trustees of Univ. of Ill.,* 852 F.2d 285, 287 (7th Cir. 1988). The purpose of our order was to allow both parties to address qualified immunity *within the scope of the summary judgment motion as it had been briefed;* it was not a license to Defendants to begin the summary judgment process anew. For the same reason, we reject Defendants' attempt to introduce new evidence in connection with their supplemental brief after the relevant discovery deadlines had expired. Our order gave them no such permission; it directed them to provide legal arguments on a particular issue that had been teed up by their existing motion and response, not to import new evidence of facts. We therefore GRANT Plaintiffs' motion to strike [Docket No. 108] the new evidence

Claims that a police officer employed "excessive force" are analyzed under the Fourth Amendment's "reasonableness" standard. *Acevedo v. Canterbury,* 457 F.3d 721, 724 (7th Cir. 2006) (citing *Graham v. Connor,* 490 U.S. 386, 395 (1989)). Determining whether the force used to "seize" an individual is reasonable under the Fourth Amendment requires balancing the individual's interests against the countervailing interests of law enforcement; an action's reasonableness must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See Graham,* 490 U.S. at 395 (citing *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)); *McKnight v. City of Evansville,* 2015 WL 1268178, at * 4 (S.D. Ind. Mar. 18, 2015). The test is not a "mechanical" one, and it "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Tennessee v. Garner,* 471 U.S. 1, 8–9 (1985).

With this in mind, three situational factors guide us in determining whether the degree of force used by a police officer was reasonable: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest." *McAllister v. Price,* 615 F.3d 877, 881 (7th Cir. 2010). There are times, of course, when the circumstances dictate that no force at all is reasonable: "[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir. 1996).

---

they submitted in support of the supplemental brief, and we do not consider that evidence in ruling on the summary judgment motion.

Here, Davis alleges that Officer Wilson pointed his Taser at him after he announced that

he was filming Officer Wilson's forceful arrest of Hudkins, and warned that he would Tase

Davis unless Davis stopped filming and sat down. Davis Am. Compl. at ¶¶ 29–30; Davis Dep.

46.[20] We conclude that this does not rise to the level of a constitutional violation. Davis's video

shows only that Officer Wilson drew the weapon and commanded Davis to sit on the ground;

neither Davis's testimony nor the video indicates that Officer Wilson took any steps to effectuate

the threat after issuing that initial command. *See* Davis Video; Davis Dep. 46–48. Drawing a

weapon is, of course, a show of force—and at least an implicit threat of the use of such force.

Multiple courts considering similar facts, however, have found that merely showing a Taser—or

indeed, a gun—to gain compliance does not exceed the *de minimis* level of force which officers

are privileged to use to effect arrests. *See Edwards v. Giles,* 51 F.3d 155, 157 (8th Cir. 1995)

("Woolman's conduct in drawing his gun and pointing it at Edwards, without any indication

Woolman intended or attempted to fire the gun, does not rise to the level of a constitutional

violation."); *Salvadon v. Ricotta,* 2013 WL 3816728, at *6 (E.D.N.Y. July 22, 2013) ("Mere

threatening language and gestures ... do not ... amount to [a] constitutional violation") (citations

omitted); *Noe v. West Virginia,* 2010 WL 3025561, at *7 (N.D.W.V. July 29, 2010) ("[M]erely

---

[20] In their response brief, Plaintiffs additionally contend that Officer Wilson roughly took Davis to the ground and that he handcuffed him in a painful manner. These allegations appear nowhere in the Amended Complaint, and Plaintiffs' attempt to construct a separate theory of excessive force based on them at the summary judgment stage is improper. *See Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 Fed. App'x 659, at *6–7 (6th Cir. 2012) (unpublished table opinion). At any rate, both accusations are contradicted by Davis's own testimony. *See* Davis Dep. 53:8–9 (regarding whether Officer Wilson "took him to the ground"), 53:13–17 (denying that handcuffs caused him any physical, as opposed to emotional, injury). Handcuffing is an integral part of an arrest, and a plaintiff must therefore allege some sort of actual injury, rather than *de minimis* discomfort or pain, to state an excessive force claim based on handcuffing. *See Fisher v. City of Las Cruces,* 584 F.3d 888, 896–897 (10th Cir. 2009). A police officer's ability to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Rebolar ex rel. Rebolar v. City of Chicago,* 897 F. Supp. 2d 723, 736 (N.D. Ill. 2012) (citing *Graham,* 490 U.S. at 396).

pointing a taser at the plaintiff cannot support a claim for excessive force.") (citing *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir. 1988)).[21]

To be sure, a plaintiff can state a prima facie claim for excessive force if a police officer deploys his weapon in a manner unconnected to the normal arrest process, or wildly in excess of the display of force reasonable under the circumstances. *See Jacobs v. City of Chicago,* 215 F.3d 758, 773–774 (7th Cir. 2000) (affirming viability of excessive force claim where defendant officer continued to point a gun at the plaintiff even after ascertaining that the plaintiff was not the person he was looking for); *Baird v. Renbarger,* 576 F.3d 340, 343 (7th Cir. 2009) (reaching the same conclusion where an officer pointed a submachine gun at a suspect without good reason for two hours). The facts before us, viewing Davis's account and his video footage in the light most favorable to him, are not nearly as extreme. Davis alleges only that Officer Wilson pointed his Taser at him and ordered him to sit down, after which he complied. Because he alleges only that Officer Wilson showed his weapon to effectuate an arrest—one we have found to have been supported by probable cause—Davis has not stated an excessive force claim. *See Rebolar ex rel. Rebolar v. City of Chicago,* 897 F. Supp. 2d 723, 736 (N.D. Ill. 2012) (distinguishing *Jacobs* and *Baird* where "the defendant police officers pointed a gun at plaintiff when they first encountered him and holstered their guns as soon as plaintiff's hands were placed in handcuffs").

Defendants' motion for summary judgment with respect to Davis's Fourth Amendment excessive force claim is accordingly GRANTED.

---

[21] *Michenfelder,* a Ninth Circuit decision often cited for this proposition, analyzed an Eighth Amendment claim rather than a Fourth Amendment excessive force claim. The distinction is not critical however, since both inquiries depend upon an objective-reasonableness standard. "The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees." *Brown v. Boone Cnty, Ark.,* 2014 WL 4404973, at *3 (W.D. Ark. July 25, 2014) (citing *Andrews v. Neer,* 253 F.3d 1052, 1060 (8th Cir. 2001)).

**V.**     ***Monell* liability against the City of Indianapolis (Hudkins Counts VII and VIII, Davis Counts V and VI)**

Both Plaintiffs assert municipal liability claims against the City of Indianapolis under 42 U.S.C. § 1983, alleging that the City's failure to train and/or discipline its police force, and Officer Wilson in particular, amounted to deliberate indifference to Plaintiffs' rights. Hudkins alleges that the city failed to train its officers, including Officer Wilson, in the "area of Fourth Amendment rights," Hudkins Second Am. Compl. at ¶¶ 115–116; more generally, he asserts that the City "failed to appropriately respond to repeated complaints and violations by Officer Wilson," and that this failure to discipline "consciously disregarded the risk" presented by Officer Wilson to the public. *Id.* at ¶¶ 121–122. Similarly, Davis alleges that the City failed to train its officers, including Officer Wilson, "concerning the safety of individuals who video recorded officer activities," Davis Am. Compl. at ¶¶ 73–75, and that its failure to discipline Officer Wilson for his "repeated complaints and violations" violated Davis's Fourth Amendment rights. *Id.* at ¶¶ 79–84.

In its landmark decision in *Monell v. Department of Social Services,* 436 U.S. 658 (1978), the Supreme Court concluded that municipalities are subject to suit as "persons" under Section 1983. 436 U.S. at 690. They are not, however, subject to *respondeat superior* liability; a plaintiff must show that the municipality itself was the proximate cause—the "moving force"—behind the deprivation of rights. *Id; Grieveson v. Anderson,* 538 F.3d 763, 771 (7th Cir. 2008); *Smith v. Ciesielski,* 975 F. Supp. 2d 930, 938 (S.D. Ind. 2013). The Seventh Circuit has identified three ways in which a municipality can be held liable for a constitutional violation:

> (1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a

> "custom or usage" with the force of law; or (3) through an allegation that the
> constitutional injury was caused by a person with "final decision policymaking
> authority."

*Calhoun v. Ramsey,* 408 F.3d 375, 379 (7th Cir. 2005) (quoting *McTigue v. City of Chicago,* 60

F.3d 381, 382 (7th Cir. 1995)). A city's failure to train its officers to respect constitutional norms

may amount to "deliberate indifference" to citizens' rights where a fact-finder can infer that the

*absence* of a proper policy "reflect[s] a decision to act unconstitutionally." *See Calhoun,* 408

F.3d at 380. *See also City of Canton v. Harris,* 489 U.S. 378, 388 (1989). Likewise, a

municipality's "persistent failure to discipline subordinates who violate civil rights [can] also

give rise to an inference of an unlawful municipal policy of ratification of unconstitutional

conduct." *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir. 1983). *See also Sledd v. Lindsay,* 102

F.3d 282, 288–289 (7th Cir. 1996).

   The scope of our *Monell* inquiry is circumscribed by the viability of Plaintiffs' individual

claims against Officer Wilson; as this Court noted in *Smith v. Ciesielski,* 975 F. Supp. 2d 930

(S.D. Ind. 2013), "[t]here can be no municipal liability under Section 1983 . . . unless there has

been a constitutional violation in the first place." 975 F. Supp. 2d at 938.[22] As we have seen,

Plaintiffs make a prima facie case with respect to only two constitutional deprivations: Davis's

claim for First Amendment retaliation and Hudkins's Fourth Amendment excessive force claim.

Both parties' briefs on the *Monell* issue in this case are confusing and disjointed. Defendants

seemingly concede that Hudkins's excessive force *Monell* claim survives summary judgment: on

two different occasions in their opening brief, they acknowledge that "there are genuine issues of

---

[22] This is *not* the same as saying that municipal liability can only attach to claims for which we have denied
summary judgment. If a plaintiff makes a prima facie case that he suffered a constitutional wrong at the hands of a
public official, but the public official is shielded by qualified immunity, we may still consider whether the
municipality has *Monell* liability for the putative violation. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293,
304–305 (7th Cir. 2010) ("[A] municipality can be held liable under *Monell*, even when its officers are not, unless
such a finding would create an *inconsistent* verdict.") (emphasis original).

material fact that preclude the entry of summary judgment in favor of Defendants on Hudkins's excessive force claim asserted against *both* [D]efendants." Defs.' Br. 1, 35 (emphasis added).[23] That evident concession notwithstanding, Defendants present their arguments as if they seek summary judgment on all *Monell* theories of liability. For their part, Plaintiffs frame the issues in a bewildering manner that muddles the nature of their claims and bears little resemblance to the way in which the *Monell* theories were presented in their complaints. We attempt to clarify this morass by focusing our discussion on the recognized categories of municipal liability, and we conclude that Plaintiffs' only viable *Monell* claim is for failure to discipline in connection with Hudkins's excessive force claim.

### A. Municipal liability for Hudkins's excessive force claim

Plaintiffs have produced no evidence that the excessive force Officer Wilson allegedly inflicted on Hudkins was the direct result of an official IMPD policy or a "widespread custom or practice" of deliberate indifference towards the Fourth Amendment rights of citizens to be free from unreasonable seizure. *Cf. Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).[24] Although they argue in conclusory fashion that the city should be liable for a general failure to discipline or train its officers, Plaintiffs point to no evidence supporting such a theory. Their focus, rather, is on Officer Wilson's own extensive disciplinary history, and they contend that a fact-finder could infer a policy of deliberate indifference from the City's failure to more effectively restrain Wilson after numerous instances of misconduct related to improper use of force.

---

[23] The only way for "both Defendants" (i.e. the City) to be liable for excessive force, of course, is through *Monell* municipal liability, since Section 1983 precludes *respondeat superior* liability. Assuming that Defendants' evident concession of this point is simply a mistake, however, we give them the benefit of the doubt.

[24] Nor do they claim, of course, that Officer Wilson himself was a person with "final policy-making authority." *Cf. Valentino v. Vill. of S. Chi. Heights,* 575 F.3d 664, 674 (7th Cir. 2009).

Officer Wilson's history is not in dispute. On three separate occasions within a single month—January 2005—Officer Wilson was found to have used inappropriate force against arrestees: "tasing" a handcuffed suspect, placing a Taser against a suspect's leg to force cooperation with a blood draw, and placing his Taser in the head/neck area of a suspect during a traffic stop. *See* Wilson Dep., Ex. 9. He received a ten-day suspension for these incidents. In July 2010, Officer Wilson pulled a man off a moving bicycle onto the ground when the man did not respond to his verbal commands; he discovered later that the man, who was compliant throughout the encounter, had been wearing headphones. His supervisor, Sergeant Mark Gregory, placed a "counseling form" in his file in response to this incident, but Officer Wilson did not receive a suspension. Gregory Dep. 35–36. Instead, IMPD responded by removing Officer Wilson from certain of his duties, referring him again to the Employee Assistance Program (EAP) for counseling, and providing him with closer "monitoring and mentoring." Defs.' Ex. 15 at 10–11. In a memorandum the next month at the close of this monitoring period, Officer Wilson's supervising sergeant stated that Officer Wilson did not present "continuing concerns," and recommended that he be returned to his normal duties, subject to some ongoing supervision. *Id.* at 11. Defendants acknowledge that, in his career with IMPD, Officer Wilson has "failed to meet the City's expectations of him" on seven different occasions. Defs.' Br. 25.

"A municipality can fairly be at fault in a case of police brutality if its policymakers knew or should have known that an officer had propensities for brutality and they either encouraged, acquiesced in, or were deliberately indifferent to those propensities." *Williams v. City of Chicago*, 658 F. Supp. 147, 154 (N.D. Ill. 1987) (citing *Brandon v. Holt,* 469 U.S. 464, 466–467 (1985)). Demonstrating deliberate indifference through a failure to discipline an officer is a "high threshold" to cross; it requires facts from which it is reasonable to infer "tacit authorization" of

37

such irregularities by the municipality. *See Sigle v. City of Chicago,* 2013 WL 1787579, at *2 (N.D. Ill. Apr. 25, 2013); *Kindle v. City of Harvey,* 2002 WL 230779, at *4 (N.D. Ill. Feb. 15, 2002). Given his repeated misuses of his Taser in 2005 and the fact that he had already been referred to the EAP for remedial counseling, the IMPD's treatment of Officer Wilson's July 2010 incident with the bicyclist is objectively troubling. His supervisor, Sergeant Gregory, wrote that the incident betrayed Officer Wilson's "lack of proper discretion and judgment," and, according to Gregory, it would have led to an unlawful arrest had other officers not intervened. Wilson Dep., Ex. 5. As Defendants implicitly concede, the IMPD apparently treated this as a therapeutic matter rather than a disciplinary one[25]; Officer Wilson was given one month of "monitoring and mentoring" and was then returned to his normal responsibilities. Defs.' Ex. 15 at 10–11.

Defendants urge, correctly, that "[i]solated instances of misconduct do not establish the inadequacy of training." Defs.' Br. 19 (citing *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir. 1993)). The Seventh Circuit has observed that, while there is no bright-line rule outlining how frequently misconduct must occur to trigger a reasonable inference that the misconduct reflects an implicit policy, one incident—or even three—will almost never be enough. *See Thomas,* 604 F.3d at 303 ("[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, except that it must be more than one instance, or even three") (citations omitted). Here, however, Officer Wilson had a substantial history of misconduct in making arrests while with the IMPD: four instances of the misuse of

---

[25] Defendants' chart of Officer Wilson's disciplinary history shows him having been disciplined four times at IMPD—once in 2002 for a preventable auto accident, once in 2005 for insubordination, once in 2005 for the three Taser incidents, and once in 2010 for interfering with a civilian's attempt to video him. Defs.' Br. 23–24 (citing Defs.' Ex. 15 at 1–10). The "mentoring and monitoring" doled out to Officer Wilson after the July 2010 incident is not included in this list.

force, and a fifth in which he interfered with the filming efforts of a bystander because the man was an "ambulance chaser that doesn't like the police." Wilson Dep. 72. The IMPD's response to the July 2010 incident, the one that most closely prefigures the kind of mistreatment Hudkins alleges here, reflected a disconcerting degree of nonchalance, and a de-escalation from its previous responses. One instance of an officer's abusive conduct might be thought a misfortune, and perhaps two is carelessness—but five incidents, four of which arguably constitute excessive force, may be evidence of a graver fault.

We accordingly DENY Defendants' motion for summary judgment on Hudkins's *Monell* municipal liability claim with respect to his "failure to discipline" theory, while we GRANT summary judgment on any other *Monell* theories of liability related to that alleged constitutional deprivation, or "the area of Fourth Amendment rights" more generally.[26]

## B. Municipal liability for Davis's First Amendment retaliation claim

Plaintiffs advance two theories by which they assert the City can be held responsible for the constitutional violation alleged in Davis's First Amendment retaliation claim: that Officer Wilson was enacting an IMPD custom or practice of suppressing bystander attempts to make audiovisual recordings of the police, and that the City's failure to properly train Wilson or discipline him for past misconduct amounted to a policy of deliberate indifference toward First Amendment rights. Plaintiffs' evidence here is considerably weaker than with respect to the issue of excessive force, and we conclude that such evidence is insufficient to withstand summary judgment on the City's *Monell* liability.

---

[26] Plaintiffs allege "failure to train" as a basis for liability as well. There is conceptual overlap, of course, between "failure to train" and "failure to discipline/failure to supervise." Since Plaintiffs have pointed to no specific alleged deficiencies in the IMPD's training process, however, the most natural fit for the type of claim they make here is failure to discipline.

In support of their "policy or custom" theory, Plaintiffs rely on a portion of Officer Wilson's deposition testimony. When questioned on the subject, Officer Wilson affirmed his belief that "individuals have the right to film the police," and that he did not generally believe it was appropriate for police to interfere with that right. Wilson Dep. 76. The portion of his testimony Plaintiffs find most damning followed immediately thereafter; when asked if he had received any training or "practice tips" from other officers on dealing with the issue of bystanders filming him, he stated: "No, because there's – I don't want to say the word on the street was, but the general practice was that you did anything you could to avoid being filmed and to avoid them filming you or allowing them to film." *Id.* at 77.

While this certainly sounds like at least anecdotal evidence of force-wide custom, Plaintiffs elide the crucial time context. The portion of Officer Wilson's testimony they quote was situated within a discussion of the 2010 incident in which he shined his flashlight in a bystander's face to prevent filming; Officer Wilson's quote thus describes his view of IMPD custom as of *before* that 2010 incident. Later in his deposition, Wilson stated that he had subsequently received training on the issue—and he asserted that he had come to a new appreciation of the possible *benefits* of being filmed after he was disciplined for that incident: "And it turns out it could benefit me in the long run, so why not let them keep filming, because it shows the actions of the other person just as well as it shows my action." *Id.* at 78. Officer Wilson's own testimony is the only piece of evidence Plaintiffs cite on this question. Wilson may or may not have been telling the truth about how receiving additional training had changed his

worldview on First Amendment rights after his 2010 disciplinary incident, but his testimony is decidedly not evidence of an IMPD custom or practice as of September 2012.[27]

Plaintiffs also argue that the City may be liable for its failure to train Officer Wilson in the area of First Amendment rights, or to discipline him for transgressing those rights. Plaintiffs have no evidence pointing to a failure to train; Officer Wilson testified, in fact, that he had received training on "individual's ability to film" since his 2010 disciplinary incident. As for failure to discipline, Plaintiffs can point to only one prior episode of misconduct: the aforementioned May 2010 incident in which Officer Wilson interfered with a bystander's filming attempt by shining a flashlight at him. He served a one-day suspension for this misconduct in August 2010. Defs.' Ex. 15 at 8. With respect to the issue of First Amendment retaliation—in contrast to excessive force—we have neither a pattern of multiple violations nor evidence of an inappropriately lax official response. At least under these circumstances, a single prior incident is insufficient to raise an inference of a failure to discipline constituting "deliberate indifference" to constitutional rights. *See Thomas,* 604 F.3d at 303; *Cosby v. Ward,* 843 F.2d 967, 983 (7th Cir. 1988) (noting that to qualify as a custom or practice, there "must be more than one instance" in which rights were violated).

We accordingly GRANT Defendants' motion for summary judgment with respect to the City of Indianapolis's *Monell* liability for the retaliatory arrest allegedly suffered by Plaintiff Davis.

---

[27] Plaintiffs also analogize to this Court's decision in *King v. City of Indianapolis,* 969 F. Supp. 2d 1085 (S.D. Ind. 2013). *King* is readily distinguishable, however. There, an officer who testified on the City's behalf in a Rule 30(b)(6) deposition explicitly stated that an officer's action in confiscating a bystander's cell phone were "consistent with IMPD policies for the preservation of evidence." 969 F. Supp. 2d at 1097. As Defendants point out, the two cases present different issues, and Plaintiffs here have pointed to nothing comparable to what the court addressed in *King*: a decision-making authority's direct testimony regarding official practice.

### VI.   Additional state-law claims

### A. Defamation *per se* against Officer Wilson and the City of Indianapolis (Hudkins Count VI)

Count VI of Hudkins's Second Amended Complaint alleges that Officer Wilson committed the tort of defamation *per se* when he misrepresented certain aspects of his arrest of Hudkins in the probable cause affidavit he submitted to the Marion Superior Court. Hudkins Second Am. Compl. at ¶¶ 99–109.

To prevail on a cause of action for defamation under Indiana law, a plaintiff must prove four elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages. *Newman v. Jewish Cmty. Ctr. Ass'n of Indianapolis*, 875 N.E.2d 729, 739 (Ind. Ct. App. 2007). A communication is "defamatory *per se*"—meaning that no proof of damages is required—if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct. *Id.* (citing *Lovings v. Thomas,* 805 N.E.2d 442, 447 (Ind. Ct. App. 2004)).

Officer Wilson's probable cause affidavit undoubtedly imputes "criminal conduct" to Hudkins—indeed, that is the very purpose of a probable cause affidavit—but his statements in such a document are absolutely privileged under Indiana law. *See Hartman v. Keri,* 883 N.E.2d 774, 777 (Ind. Ct. App. 2008) ("Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements."). Absolute privilege provides judges, attorneys, parties and witnesses, in connection with a judicial proceeding, immunity from liability even if they publish defamatory material with an improper motive; this extends to statements, like a probable cause affidavit, made preliminary to a judicial proceeding. *Van Eaton v. Fink*, 697 N.E.2d 490, 494 (Ind. Ct. App. 1998).

Plaintiffs do not dispute the privileged nature of the probable cause affidavit. Instead, they seek to expand the scope of the claim to include conversations Officer Wilson allegedly had with others, including fellow police officer Elise Torres, who had been present the night he arrested Hudkins and Davis. *See* Pls.' Resp. 30 (citing Wilson Dep. 12; Torres Dep. 19–20). Hudkins's Second Amended Complaint, however, exclusively concerns the statements Officer Wilson made in his affidavit to the court; nowhere—either in its list of factual allegations or within Count VI itself—does the complaint Officer Wilson's defamatory conversations with other officers. Even assuming that introducing such new allegations in response to summary judgment is appropriate, Plaintiffs have not thereby established the elements of a defamation claim. Officer Wilson testifies that, after the J.W. Marriott lobby video had been excerpted in the WISH-TV news story about his arrests of Hudkins and Davis, he had had "generalized conversations," such as "coffee table talk, talk over dinner," about the video with unspecified persons. Wilson Dep. 12. For her part, Officer Torres testifies that, at some point after the news story had run on the air, Officer Wilson asked her if she had "heard anything" about it, and suggested she watch the video. Torres Dep. 19–20. This evidence does not establish that Wilson said *anything* in particular about either the videotape of the incident or the incident itself—let alone anything defamatory about Brian Hudkins. Evidence that two people communicated about a video that features Hudkins is not evidence that either of the two participants in the conversation defamed him. *Cf. Newman,* 875 N.E.2d at 739.

We accordingly GRANT Defendants' motion for summary judgment on Hudkins's defamation *per se* claim against Officer Wilson and the City of Indianapolis.

**B. Negligent retention and training against the City of Indianapolis (Hudkins Count IX)**

Hudkins brings a state-law negligent retention and training claim against the City of Indianapolis. Hudkins Second Am. Compl. at ¶¶ 128–134.

Indiana law recognizes an employer's negligent hiring, supervision, training, or retention of an employee as a basis of liability separate from its possible *respondeat superior* liability for an employee's tortious conduct. *See generally Interim Healthcare of Fort Wayne, Inc. v. Moyer ex rel. Moyer,* 746 N.E.2d 429 (Ind. Ct. App. 2001). However, "the employment and supervision of deputies and employees in governmental offices . . . is a discretionary function" immunized under the Indiana Tort Claims Act. *Foster v. Pearcy,* 387 N.E.2d 446, 450 (Ind. 1979). *See also* Ind. Code § 34-13-3-3(7). As we recognized in *Smith v. Ciesielski,* 975 F. Supp. 2d 930 (S.D. Ind. 2013), this principle of immunity admits of a narrow exception: an official's supervisory conduct does not merit exemption from suit if it "violate[s] clearly established statutory or constitutional rights of which a reasonable person should have known." *Cantrell v. Morris,* 849 N.E.2d 488, 496 (Ind. 2006). As the language indicates, discretionary function immunity under Indiana law is thus co-extensive with qualified immunity under the federal Section 1983 standard. *Id.*

Defendants invoke discretionary function immunity generally, and they argue that no exception applies because neither the City nor Officer Wilson violated Plaintiffs' constitutional rights. Defs.' Reply 16–17.[28] As noted above, we have found that a genuine issue of material fact exists with respect to the City's municipal liability under Section 1983 for failure to discipline Officer Wilson in relation to the use of excessive force. *See supra,* § V(A). To the extent that federal claims against Officer Wilson and the City withstand summary judgment, the analogous

---

[28] Defendants do not make the separate argument that the right in question was not "clearly established," and so we do not consider that prong of the common-law qualified immunity analysis. *See* Defs.' Reply 16–17.

state-law failure to discipline claim survives as well.[29] All other negligence claims relating to the

IMPD's employment and supervision of Officer Wilson are barred by the ITCA. *See* Ind. Code §

34-14-3-3(7).

Defendants' motion for summary judgment on Hudkins's claim for negligence against

the City of Indianapolis is DENIED with respect to the City's negligent discipline/supervision of

Officer Wilson for his use of excessive force; the motion is GRANTED in all other respects.

## C. General Negligence against Officer Wilson and the City of Indianapolis (Hudkins Count X, Davis Count VII)

Both Plaintiffs' complaints contain general negligence counts against Officer Wilson and

the City that simply recite the elements of common-law negligence with no factual adornment.

Hudkins Second Am. Compl. at ¶¶ 135–138; Davis Am. Compl. at ¶¶ 86–89.

To the extent that this conclusory "general negligence" count seeks to stand on its own, it

falls far short of a plaintiff's burden of substantiating his claim that a particular duty of care

existed and that a defendant's breach proximately caused him a specific harm, *see generally*

*Estate of Mintz v. Conn. Gen. Life Ins. Co.*, 905 N.E.2d 994 (Ind. 2009)—not to mention the

pleading standards imposed by Rule 8 of the Federal Rules of Civil Procedure. Fed. R. Civ. Pro.

8(a); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (holding that Rule 8 "demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation"). To the extent that it incorporates

the factual allegations listed elsewhere in the Plaintiffs' complaints in support of their more

specific tort claims, it is duplicative and unnecessary. *See INS Investigations Bureau, Inc. v. Lee,*

---

[29] Hudkins styles his negligence claim as one for "negligent retention and training," but he alleges that the city "knew or reasonably should have known of Officer Wilson's misconduct and failed to take proper action." Hudkins Second Am. Compl. at ¶ 133. We believe that since negligent retention and negligent supervision claims overlap so significantly, Hudkins's complaint gives fair notice of a failure to discipline theory given its factual allegations. Defendants do not parse the terminological distinction, *see* Defs.' Reply 16–17 (referring to Plaintiffs' negligence theory in catch-all terms as one for "negligent training"), and neither do we.

784 N.E.2d 566, 577 (Ind. Ct. App. 2003) (noting that the law disallows "a double recovery for a single wrong").[30]

Defendants' motion for summary judgment on Plaintiffs' "general negligence" claims is accordingly GRANTED.

### D. Assault against Officer Wilson and the City of Indianapolis (Davis Count III)

Davis alleges that Officer Wilson assaulted him during the confrontation at the J.W. Marriott, and that the City of Indianapolis is subject to *respondeat superior* liability for the tort. Davis Am. Compl. ¶¶ 59–62.

Defendants argue that two different provisions of the ITCA furnish Officer Wilson immunity for his conduct: "law enforcement immunity" under Ind. Code § 34-13-3-3(8)(A), and the statute's more general grant of immunity for a government employee's actions in the scope of employment, Ind. Code § 34-13-3-5(b). Defs.' Br. 29–30. The ITCA's immunity shield is indeed a broad one; it "goes so far as to protect officers from liability for both tortious and even criminal acts where the purpose of the employee's conduct was to further the employer's business." *McConnell v. McKillip,* 573 F. Supp. 2d 1090, 1103–1104 (S.D. Ind. 2008) (citing *City of Anderson v. Weatherford,* 714 N.E.2d 181, 186 (Ind. Ct. App. 1999)). There are limits, however. The statute itself states that law enforcement immunity does not shield an officer from

---

[30] At any rate, a government employee's "negligence" in the scope of employment is immunized by the ITCA; a plaintiff must allege conduct of a greater degree of blameworthiness than mere negligence to recover against a government employee in tort—or else he must show that the employee was acting outside the scope of his employment. Plaintiffs repeatedly allege that Officer Wilson was acting under color of state law here, which bars a catch-all "negligence" accusation as a substantive matter, in addition to being subject to summary judgment for the reasons described above. *See* Ind. Code § 34-13-3-5(c) (noting that immunity applies except to conduct that was "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the employee personally").

claims for false arrest or false imprisonment, *see* Ind. Code § 34-13-3-3(8), and Indiana courts have repeatedly held that an officer's use of excessive force is also outside the bounds of immunity. *See Wilson v. Isaacs,* 929 N.E.2d 200, 203 (Ind. 2010); *Kemezy v. Peters,* 622 N.E.2d 1296, 1297 (Ind. 1993) (holding that "law enforcement officers owe a private duty to refrain from using excessive force in the course of making arrests," and that "the use of excessive force is not conduct immunized" under the ITCA).

Officer Wilson is therefore not immune from allegations of torts such as assault or battery arising out of his use of excessive force in detaining a suspect. *See Wilson,* 929 N.E.2d at 203– 204 ("If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery.") (citing *Crawford v. City of Muncie,* 655 N.E.2d 614, 622 (Ind. Ct. App. 1995)).  Here, Davis's claim fails not because of the ITCA, but because the evidence does not support an inference that Officer Wilson used excessive force toward him. Excessive force claims under Indiana law are governed by the same "objective reasonableness" standard governing Fourth Amendment excessive force claims. *O'Bannon v. City of Anderson,* 733 N.E.2d 1, 3 (Ind. Ct. App. 2000) (noting that **"**excessive force claims are governed by a Fourth Amendment objective reasonableness standard" and that Indiana's codification of the common-law standard, Ind. Code § 35–41–3–3(b), "reflects the same principles"). As we have already discussed, Davis has not made out a Fourth Amendment excessive force claim against Officer Wilson, *see supra* § IV; his assault claim derived from those same excessive force allegations— and judged according to the same standards—fails as well.[31]

---

[31] The only basis for the City's liability is *respondeat superior,* and thus the claim against the City fails as well.

Defendants' motion for summary judgment on Davis's state-law assault claim is accordingly GRANTED.

**E. Battery against Officer Wilson and the City of Indianapolis**

Hudkins's Second Amended Complaint alleges that Officer Wilson committed common-law battery both when he tackled him inside the J.W. Marriott lobby (Count III) and when he took him to the ground again in the hotel's driveway near his squad car (Count IV). Hudkins Second Am. Compl. ¶¶ 82–91.

Defendants concede that genuine issues of material fact preclude summary judgment on Hudkins's Fourth Amendment excessive force claim, and they accordingly acknowledge that summary judgment cannot be granted in favor of the City on these battery claims that arise out of the same allegations of excessive force. Defs.' Br. 31. They seek summary judgment only in favor of Officer Wilson, whom they contend is shielded by the ITCA's immunity provisions. *Id.* (citing Ind. Code § 34-13-3-5(b)).

Defendants overestimate the scope of ITCA immunity as applied to Officer Wilson's conduct. As we have just noted, the statute's grant of immunity does not extend to a claim for battery arising out of an officer's use of excessive force. *See Wilson,* 929 N.E.2d at 203. *See also Reiner v. Dandurand,* 33 F. Supp. 3d 1018, 1031–1033 (N.D. Ind. 2014).[32]

---

[32] Defendants cite the ITCA's more general "scope of employment" provision rather than the more specific law enforcement immunity provision, but Indiana cases have made clear that a battery claim stemming from excessive force is outside the scope of ITCA, regardless of which particular provision the defendant seeks to shelter under. "If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery . . . . [W]e find that the statutory provision restrains the statutory immunity from erecting a shield to liability for conduct contrary to the statute." *Wilson,* 929 N.E.2d at 203–204.

There is sufficient evidence in the record to support Hudkins's prima facie claim that Officer Wilson inflicted "harmful or offensive contact" upon him in using excessive force to make an arrest, both inside the J.W. Marriott lobby and in the hotel's driveway. Marriott Lobby Video at 22:11:10–22:11:41; Driveway Video at 22:16:42–22:23:00. *See Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2009) (citing Restatement (Second) of Torts § 13 (1965)). Defendants' motion for summary judgment on Hudkins's battery claims against Officer Wilson is accordingly DENIED.

**F. False light invasion of privacy against Officer Wilson and the City of Indianapolis (Hudkins Count XI, Davis Count VIII)**

Both Plaintiffs assert state-law claims against Defendants for the invasion of privacy by false light. Hudkins Second Am. Compl. at ¶¶ 139–144; Davis Am. Compl. at ¶¶ 90–95.

The tort of false light invasion of privacy provides a plaintiff recourse where he has suffered "publicity that unreasonably places [him] in a false light before the public." *Lovings v. Thomas,* 805 N.E.2d 442, 446 (Ind. Ct. App. 2004) (quoting *Near East Side Cmty. Org. v. Hair,* 555 N.E.2d 1324, 1335 (Ind. Ct. App. 1990)). In defining the scope of the cause of action, Indiana looks to the Restatement (Second) of Torts, which provides as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Branham v. Celadon Trucking Serv., Inc.*, 744 N.E.2d 514, 524 (Ind. Ct. App. 2001) (quoting

Restatement (Second) of Torts § 652E (1977)). "Publicity" occurs when: "the matter is made

public, by communicating it to the public at large, or to so many persons that the matter must be

regarded as substantially certain to become one of public knowledge. The difference is not one of

the means of communication, which may be oral, written or by any other means. It is one of a

communication that reaches, or is sure to reach, the public." *Id.* (quoting Restatement (Second)

of Torts § 652E, comment a (1977)). False light invasion of privacy is similar to defamation, but

protects different interests; "[d]efamation reaches injury to reputation, while privacy actions

involve injuries to emotions and mental suffering." *Newman,* 875 N.E.2d at 743.

Like the defamation claim to which they are akin, Plaintiffs' false light invasion of

privacy claims against Officer Wilson fail. As with Hudkins's defamation claim, the only

evidence upon which Plaintiffs rely here is Officer Wilson's probable cause affidavit and the fact

that he discussed the video of the incident after it had been featured on a WISH-TV news story.

The probable cause affidavit is absolutely privileged, and can serve as the predicate for a false

light claim no more than it can support a defamation claim. *See Hartman*, 883 N.E.2d at 777;

*Van Eaton,* 697 N.E.2d at 494.

As for Officer Wilson's other statements, none of them "gave publicity" to Plaintiffs'

private matters. Plaintiffs point to evidence that Officer Wilson engaged in "coffee table talk"

with unnamed others about the J.W. Marriott lobby video after it was featured in a WISH-TV

story, Wilson Dep. 12; that he mentioned the video to Officer Torres (who had been present the

night of the incident) and suggested she watch it, Torres Dep. 19–20; and that another co-worker,

Officer Cedric Young, noted that the news story featuring the video was the topic of general

conversation at IMPD roll call after its release. Young Dep. 35. All of these conversations

occurred *after* the video footage of the incident between Officer Young and Plaintiffs had been shown to the public on a news broadcast—a broadcast in which Officer Wilson had no hand, and to whom it was likely a source of chagrin. It therefore stretches credulity to suggest that Officer Wilson's conversations with his family, friends, or co-workers about the video "publicized" its contents. Where a statement is "not communicated to the public at large or even to a substantial number of people," a plaintiff cannot state a claim for false light invasion of privacy. *See Lovings,* 805 N.E.2d at 446. Even if Officer Wilson had talked to so many people about the arrest that the topic of his conversation was "substantially certain to become one of public knowledge," Plaintiffs have no evidence that he said anything that the "public" would not already know by virtue of the video having previously run on the evening news. *Cf.* Restatement (Second) of Torts § 652E, comment a (1977).

We therefore GRANT Defendants' motion for summary judgment on Plaintiffs' claims for false light invasion of privacy.

## G. Negligent infliction of emotional distress against Officer Wilson and the City of Indianapolis (Hudkins Count XII, Davis Count IX)

Both Plaintiffs assert claims for negligent infliction of emotional distress. Hudkins Second Am. Compl. at ¶¶ 145–150; Davis Am. Compl. at ¶¶ 96–101.

Defendants concede that Hudkins's negligent infliction of emotional distress claim against the City survives summary judgment. *See* Defs.' Br. 1. For the same reasons we have already discussed, we reject their argument that the ITCA's "scope of employment" immunity shields Officer Wilson from liability to Hudkins arising out of his alleged use of excessive force. *See supra,* § VI(E).

An action for negligent infliction of emotional distress is a "piggyback" action, a vehicle for redressing the emotional damages flowing from some predicate tort, *Spangler v. Bechtel,* 958 N.E.2d 458, 466 (Ind. 2011); such a "claim . . . cannot survive without some underlying negligence." *See Brown v. Danville Cmty. Sch. Corp.*, 2006 WL 693983, at *5 (S.D. Ind. Mar. 15, 2006). As Defendants point out, Davis's claim thus fails unless he himself was the victim of a tort, or he was a bystander to the death or severe injury of a close relative. *See Spangler,* 958 N.E.2d at 466 (discussing the "impact rule" and the "bystander rule"). In their response brief, Plaintiffs argue that Davis has met this burden because he suffered assault and excessive force at the hands of Officer Wilson—arguments we have already rejected as unsupported by the evidence. *See supra,* § IV.[33]

We accordingly DENY Defendants' motion for summary judgment with respect to Hudkins's claim for negligent infliction of emotional distress against Officer Wilson, and GRANT Defendants' motion with respect to Davis's claim for negligent infliction of emotional distress against all Defendants.

## VII.   Conclusion

Our resolution of Defendants' motion for partial summary judgment reflects the core reality disclosed by the video footage and testimony concerning the September 6, 2012 incident at the J.W. Marriott: Officer Wilson appears to have reacted to the situation in a disproportionate manner, employing an unnecessary—arguably unconstitutional—degree of force in arresting

---

[33] Plaintiffs do not argue that the First Amendment deprivation Davis allegedly suffered as a result of Officer Wilson's retaliatory arrest can serve as the predicate tort, and it is unlikely that such an abstract injury could satisfy Indiana's byzantine "impact rule" for emotional distress recovery. *Cf. Spangler,* 958 N.E.2d at 466 (noting that "we have permitted recovery so long as the plaintiff personally sustained a *physical* impact, in addition to emotional distress damages") (emphasis added) (citing *Bader v. Johnson,* 732 N.E.2d 1212, 1215, 1222 (Ind. 2000)).

Plaintiff Hudkins. The claims that survive summary judgment are those predicated, in one way or another, on that alleged transgression.

For the foregoing reasons, we resolve the pending motions as follows:

(1)     Plaintiffs' objection [Docket No. 74] to the Magistrate's Order [Docket No. 70] on Defendants' motion to quash deposition notice is OVERRULED, and the Magistrate's order is upheld.

(2)     Defendants' motion for partial summary judgment is GRANTED with respect to the following claims asserted by Plaintiffs:

- False or unlawful arrest against Officer Wilson under the Fourth Amendment (Hudkins Count I, Davis Count II)[34]

- Malicious prosecution against all Defendants (Hudkins Count V, Davis Count IV)

- Retaliatory arrest against Officer Wilson under the First Amendment (Davis Count I)

- Davis's excessive force claim against Officer Wilson under the Fourth Amendment (Davis Count II)

- All *Monell* claims against the City of Indianapolis, except for Hudkins's failure-to-discipline claim (Hudkins Count VII, Davis Count V, Davis Count VI)

- Defamation *per se* against all Defendants (Hudkins Count VI)

- All state-law negligent hiring and training claims against the City of Indianapolis, except for Hudkins's failure to discipline claim (Hudkins Count IX, in part)

- "General negligence" against all Defendants (Hudkins Count X, Davis Count VII)

- Assault against all Defendants (Davis Count III)

---

[34] As we noted above, *see supra* n.6, we also dismiss Hudkins's Count II, which is a vague Fourth Amendment claim that fails to state a cause of action.

- False light invasion of privacy against all Defendants (Hudkins Count XI, Davis Count VIII)

- Davis's claim for negligent infliction of emotional distress against all Defendants (Davis Count IX)

Summary judgment is DENIED with respect to the following claims:

- Hudkins's failure to discipline *Monell* claim against the City of Indianapolis (Hudkins Count VIII)

- Hudkins's state-law failure to discipline claim against the City of Indianapolis (Hudkins Count IX, in part)

- Hudkins's claim for battery against Officer Wilson (Hudkins Counts III, IV)

- Hudkins's claim for negligent infliction of emotional distress against Officer Wilson (Hudkins Count XII)

Defendants did not seek summary judgment with respect to Hudkins's Fourth Amendment excessive force claim (Hudkins Count I), Hudkins's claim for battery against the City of Indianapolis (Hudkins Counts III and IV), and Hudkins's claim for negligent infliction of emotional distress against the City of Indianapolis (Hudkins Count XII).

(3)    Plaintiffs' motion to strike [Docket No. 108] is GRANTED. *See supra,* n.19.

This litigation shall proceed on the surviving claims.

IT IS SO ORDERED.

Date:     08/06/2015

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Scott Leroy Barnhart
ATTORNEY AT LAW
barnhart.scott@gmail.com

Bradley A. Keffer
KEFFER BARNHART LLP
keffer@kbindy.com

Scott Leroy Barnhart
KEFFER BARNHART LLP
barnhart.scott@gmail.com

Amanda J. Dinges
OFFICE OF CORPORATION COUNSEL
amanda.dinges@indy.gov

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS & HASBROOK
jfk@rucklaw.com